IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



| UNITED STATES OF AMERICA, | CR 19-48-BLG-SPW |
|---|---|
| Plaintiff, | |
| | ORDER |
| vs. | |
| BLAKE ZELON ISGET and HERMAN ELISEO MENENDEZ, | |
| Defendants. | |

FEB 1 8 2020

Clerk, U S District Court
District Of Montana
Billings

Before the Court is a motion to suppress approximately a pound of methamphetamine and a half pound of cocaine seized from a vehicle driven by the Defendants. Defendant Herman Eliseo Menendez additionally seeks to suppress statements made during a later custodial interrogation. For the following reasons, the Court denies the motions.

I.  Facts

In July 2018, DEA Special Agent Jeremy Crowther received a tip from a confidential informant that Blake Isget was dealing cocaine and marijuana in Billings, Montana. Agent Crowther trusted the informant because the informant had established a good track record in prior investigations, including making controlled buys and providing truthful information which law enforcement

1

corroborated. The informant told Agent Crowther he or she had personally purchased LSD and marijuana from Isget but knew Isget also sold cocaine. Based on the tip, Agent Crowther opened an investigation into Isget.

A few months later, around October, Agent Crowther received another tip from a different confidential informant. The second confidential informant told Agent Crowther that Isget and Isget's roommate routinely traveled to California in a white Kia Sportage to purchase large quantities of cocaine, which they would then bring back to Billings to sell. The informant didn't know the roommate's name but stated the roommate was a mid-20's Hispanic male. Records and police surveillance revealed a white Kia Sportage was registered to Isget's address and often found parked there.

In November, Agent Crowther and his team made a significant break in the case. Utilizing the second confidential informant, Agent Crowther set up a controlled buy with Isget. The second confidential informant exchanged text messages with Isget, wherein they discussed the increased price for an ounce of cocaine because it was a new, and "better," product Isget had recently brought back to Billings. They arranged to meet in a vehicle near Isget's residence. In the vehicle were Isget, the second confidential informant, and Agent Crowther

acting undercover. Agent Crowther witnessed Isget sell an ounce of cocaine to the second confidential informant for $1,650.00.

In December, Agent Crowther and his team made another break through. By chance, Billings police stopped the white Kia Sportage for a minor traffic violation. The driver was Herman Eliseo Menendez, the passenger was Isget. During the stop, Menendez, a mid-20s Hispanic male, identified himself as Isget's roommate. Either later that month or in early January 2019, the white Kia Sportage was stopped again for a minor traffic violation, this time in Utah. The driver and passenger were again Menendez and Isget. Menendez and Isget told the Utah trooper they were coming back from California. Isget was arrested on an unrelated Montana warrant and extradited back to Montana, and Menendez was released with the white Kia Sportage.

Isget was jailed in Montana until around early February. Shortly after Isget's release, both the first and second confidential informants separately contacted Agent Crowther with new information. According to the confidential informants, Isget had contacted each to ask if they wanted to purchase marijuana. Isget stated he was trying to raise money to make a trip to California to purchase cocaine.

Based on the information gathered, Agent Crowther's team applied for a warrant to place a GPS tracker on the white Kia Sportage. On February 12, 2019, a Montana state judge granted the warrant. The warrant provided Agent Crowther could affix the tracker for a period of 30 days. On February 14, Agent Crowther attached the tracker to the white Kia Sportage. On February 26, the tracker alerted Agent Crowther that the white Kia Sportage had left Billings and traveled to southern California. No more than two days later, the tracker alerted Agent Crowther the white Kia Sportage left California and appeared to be heading back to Montana.

On March 1, when the white Kia Sportage returned to Montana as predicted, Agent Crowther devised a plan to conduct what's known as a wall stop. A wall stop is a law enforcement technique wherein a police officer uses a traffic stop as a ruse to trick someone into believing they've been stopped for a traffic infraction when truthfully law enforcement has already developed probable cause to believe the person is transporting contraband. The ruse prevents the person from being tipped off that he or she is the subject of a drug investigation while law enforcement either develops independent probable cause to search the vehicle during the stop or applies for a warrant based on the prior probable cause developed during the investigation.

Over a series of text messages, phone calls, and a face to face meeting the morning of March 1, an intermittent discussion of the investigation took place between Agent Crowther and Montana Highway Patrol K9 Officer Erick Fetterhoff. After apprising Officer Fetterhoff of the situation, Agent Crowther directed him to wall stop the white Kia Sportage when it arrived in the Billings area. Officer Fetterhoff drove himself into position and waited. While waiting, Officer Fetterhoff ran a records check of Isget and Menendez and learned both had suspended driver's licenses.

Around noon, Officer Fetterhoff observed the white Kia Sportage drive past him on the interstate, so he began following it looking for traffic infractions. It didn't take long for the white Kia Sportage to change lanes and pull directly behind a semi-truck, following no more than one to one and a half car lengths behind the semi. In Officer Fetterhoff's training and experience, at least three car lengths is required to provide a safe distance between vehicles.

As planned, Officer Fetterhoff wall stopped the white Kia Sportage. Menendez was the driver and Isget was the passenger. Officer Fetterhoff went through the normal motions of a traffic stop, including issuing a ticket for driving with a suspended license and a warning for following too closely. After issuing the ticket and warning, Officer Fetterhoff deployed his dog around the vehicle and

it indicated to the presence of narcotics. Officer Fetterhoff told Menendez and Isget they were free to leave but he was seizing the vehicle pending a search warrant. Unbeknownst to Menendez and Isget, Agent Crowther and his team had already applied for, and were granted, a search warrant while Officer Fetterhoff was conducting the traffic stop. When Agent Crowther and others executed the search warrant, they uncovered approximately a pound of methamphetamine and a half-pound of cocaine.

On April 19, 2019, Isget and Menendez were indicted for Conspiracy to Possess with Intent to Distribute Controlled Substances, Possession with Intent to Distribute Controlled Substances, and Distribution of Cocaine. (Doc. 1). On April 22, Agent Crowther arrested Menendez and brought him to the DEA's Billings office for questioning. Due to prior interactions, Agent Crowther knew Menendez was fluent in both English and Spanish. Agent Crowther was also fluent in both English and Spanish and was a certified Spanish linguist by the Department of Defense.

Agent Crowther began the interrogation by explaining to Menendez, in English, that the interrogation was Menendez's opportunity to help himself by providing law enforcement information in exchange for leniency from the U.S. Attorney's office. Menendez replied in Spanish that he had information to give

6

them but wanted his rights respected and needed a lawyer. Agent Crowther responded in English that Menendez had a right to a lawyer and that he would read Menendez his *Miranda* rights and if Menendez wanted a lawyer, that's the route they'd go. Agent Crowther asked in English whether Menendez wanted his rights read in English or Spanish, to which Menendez responded in Spanish, "however you like." Agent Crowther proceeded to read Menendez his *Miranda* rights in English and asked if Menendez would still like to answer questions. Menendez nodded and responded in Spanish, "a ver," which translates literally to "to see," but in the context of the conversation meant "let's see," or "let's go." Agent Crowther tried to clarify Menendez's wishes. Speaking in Spanish this time, he asked Menendez, "So do you want a lawyer or do you want to talk to me? Do you want to answer some questions?" Menendez, again nodding, replied "a ver despara," which meant "let's see," or "go ahead." Agent Crowther asked if they could do the interrogation in English because there were non-Spanish speaking agents in the room, and Menendez agreed. Agent Crowther proceeded to interrogate Menendez about the charges, resulting in Menendez incriminating himself.

**II. Discussion**

Isget and Menendez argue the GPS tracking information was illegally obtained because the tracker did not comply with Montana law and can therefore not be used in any reasonable suspicion or probable cause determination. Isget and Menendez additionally argue the evidence seized from the Kia should be suppressed because there was no reasonable suspicion to stop the Kia and even if there was, the stop was unconstitutionally extended. Menendez also argues incriminating statements he made during his interrogation should be suppressed because he requested a lawyer.[1]

A.   GPS Tracker

An analysis of whether the GPS tracking warrant complied with Montana law is unnecessary because, to be excluded in federal court, evidence must violate either the Constitution or a federal law that provides for suppression as a remedy. *United States v. Becerra-Garcia*, 397 F.3d 1167, 1173 (9th Cir. 2005). Under the Fourth Amendment, the placement of the GPS tracker on the Kia was a search requiring a warrant or warrant exception. *United States v. Jones*, 565 U.S. 400, 404-405 (2012). A warrant has four requirements: (1) a neutral and disinterested

---

[1] Menendez further argues his statements made during the stop should be suppressed because he was not Mirandized. However, roadside *Terry* stops do not implicate *Miranda* absent certain circumstances, none of which are present here. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).

magistrate; (2) sworn affidavits; (3) probable cause; and (4) a particular description of the things to be seized or the place to be searched. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). The Defendants do not contend the government has failed to meet any of these requirements.

The Defendants do contend, relatedly, that the vehicle was tracked for over 45 days, which is longer than the time period allowed under Federal Rule of Criminal Procedure 41(e)(2)(C). The Defendants' argument rests on a disputed issue of fact. The date listed on the GPS tracking warrant is January 12, 2019. The date listed on the GPS tracking warrant application is February 12, 2019. The GPS tracking of the California trip occurred from February 26 until March 1, 2019. Thus, whether the vehicle was tracked within the 45 day window provided in Rule 41(e)(2)(C) depends on whether the warrant was issued January 12 or February 12. The Court finds the warrant was issued on February 12. Agent Crowther testified that the January 12 date on the search warrant was a clerical error, and that the search warrant was issued on February 12 consistent with the February 12 date on the search warrant application. The Court considers Agent Crowther's explanation credible and corroborated by the search warrant application and his testimony that the GPS tracker was attached to the Kia on February 14.

Therefore, the GPS tracking data was not obtained in violation of the constitution or a federal law that provides for suppression as a remedy, and the Court will include it in any reasonable suspicion or probable cause determination to which it is properly considered.

**B.     The Stop of the Kia**

The Fourth Amendment permits brief investigative stops when a law enforcement officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 134 S.Ct. 1683, 1687 (2014) (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). The reasonable suspicion necessary to justify an investigative stop is dependent upon both the content of information possessed by police and its degree of reliability. *Navarette*, 134 S.Ct. at 1687 (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)).

Reasonable suspicion need not be based solely on an officer's personal observation; the officer may rely on information supplied by another person. *Navarette*, 134 S.Ct. at 1688 (citing *Adams v. Williams*, 407 U.S. 143, 147 (1972)). But information supplied by an informant must have sufficient indicia of reliability before it can contribute to an officer's reasonable suspicion. *Navarette*, 134 S.Ct. at 1688. Multiple factors bear on the reliability of information supplied by an informant. *See White*, 496 U.S. 325 (independent police corroboration of

information); *Florida v. J.L.*, 529 U.S. 266 (2000) (anonymity of informant); *United States v. Terry-Crespo*, 356 F.3d 1170, 1176 (9th Cir. 2004) (exigent circumstances); *Terry-Crespo*, 356 F.3d at 1176-1177 (whether informant's knowledge was first-hand or second-hand); *Terry-Crespo*, 356 F.3d at 1177 (whether informant's report was contemporaneous with suspected criminal activity). In determining reasonable suspicion, the Court must consider all of the information under the totality of the circumstances. *Navarette*, 134 S.Ct. at 1687.

If a person is stopped for violating the traffic code, the stop may not be prolonged beyond the time reasonably required to complete the mission of the stop. *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate that purpose." *Rodriguez*, 135 S.Ct. at 1614. Authority for the stop ends when tasks tied to the traffic infraction are, or reasonably should have been, completed. *Rodriguez*, 135 S.Ct. at 1614. Such tasks typically include checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Rodriguez*, 135 S.Ct. at 1615.

The Defendants contend Officer Fetterhoff did not have reasonable

suspicion to stop the Kia for following too closely, but even if he did, the stop was unconstitutionally prolonged beyond that purpose. The Defendants are incorrect because the stop does not even implicate a *Rodriguez* analysis.

The given reason for the stop, following too closely, was a ruse to protect the drug investigation into the Defendants. The real reason for the stop was Agent Crowther developed not just reasonable suspicion, but probable cause that the Defendants were travelling back from California with narcotics. Agent Crowther's probable cause was based on information supplied by confidential informants, a controlled buy, and GPS tracking data.

The first informant told Agent Crowther he or she had personally purchased LSD and marijuana from Isget but knew Isget also sold cocaine. The second informant told Agent Crowther that Isget and Isget's roommate routinely traveled to California in a white Kia Sportage to purchase large quantities of cocaine, which they would then bring back to Billings to sell. The informant didn't know the roommate's name but stated the roommate was a mid-20's Hispanic male. A later traffic stop revealed Isget's roommate was Menendez, a mid-20's Hispanic male. Records and police surveillance revealed a white Kia Sportage was registered to Isget's address and often found parked there.

Agent Crowther and the second informant set up a controlled buy with Isget

wherein Isget sold them an ounce of cocaine, which Isget described as a new, "better," product he had recently brought back to Billings. A month later, Utah police stopped Isget and Menendez on a trip back from California. When Isget was arrested on an unrelated warrant and subsequently released, the two informants independently told Agent Crowther Isget was attempting to sell marijuana to raise money for a trip back to California to obtain cocaine. Using that information, Agent Crowther obtained a warrant to install a GPS tracker on the Kia. Only a couple of weeks later, the GPS tracking device showed the Kia drove to California, stayed for at most two days, and returned to Montana.

Based on the totality of the information, the Court holds Agent Crowther had probable cause to believe Isget and Menendez were transporting narcotics back from California on March 1. Although Agent Crowther did not make the stop, the Court may impute his knowledge to Officer Fetterhoff under the collective knowledge doctrine because Agent Crowther directed Officer Fetterhoff to conduct the stop. *United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010). Because Officer Fetterhoff had probable cause to believe Isget and Menendez were transporting narcotics, he was authorized to stop the vehicle and its occupants and conduct a drug investigation, including the use of a drug dog. The stop therefore was not without reasonable suspicion or unreasonably prolonged because the very

purpose of the stop was to conduct a drug investigation, for which Officer Fetterhoff had probable cause.

### C. Menendez's interrogation

"Invocation of the *Miranda* right to counsel, 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis v. U.S.*, 512 U.S. 452, 459 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). The request must be sufficiently clear that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Davis*, 512 U.S. at 459. Officers are free to continue questioning if the statement is not an unambiguous request for counsel. *Davis*, 512 U.S. at 459. The *Davis* unambiguous standard is applied stringently. *See Davis*, 512 U.S. at 462 ("[m]aybe I should talk to a lawyer" was ambiguous); *Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003) ("I think I would like to talk to a lawyer" was ambiguous); *United States v. Doe*, 60 F.3d 544, 546 (9th Cir. 1995) (statement by juvenile's mother that "maybe he ought to see an attorney" was ambiguous).

Here, Menendez did not unambiguously request an attorney. Although his initial statement, that he wanted his rights respected and needed a lawyer, certainly satisfied *Davis*'s standard, Menendez quickly walked back that statement and

14

suggested instead that he would wait and see if he wanted a lawyer. Agent Crowther attempted to clarify the ambiguity by asking, in Spanish, "So do you want a lawyer or do you want to talk to me? Do you want to answer some questions?" to which Menendez nodded and again suggested he would wait and see, indicating the questioning could proceed. A reasonable officer under these circumstances would not have understood Menendez to have requested an attorney because Menendez maintained he would wait and see when asked to clarify his request. *Davis*, 512 U.S. at 459.

### III. Conclusion

The Defendants' motions to suppress (Docs. 63 and 66) are denied.

DATED this 18th day of February, 2020.

SUSAN P. WATTERS
United States District Judge